# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

WHITNEY BRAVO,

                    *Plaintiff,*

      -against-

DELTA AIR LINES, INC.*,*

                  *Defendant.*

**Case No. 20-cv-5769**

## COMPLAINT

## JURY TRIAL DEMANDED

## NATURE OF ACTION

1.      Plaintiff Whitney Bravo ( "Plaintiff"), by her attorneys, Crumiller P.C., brings this action against Delta Air Lines, Inc. ("Defendant" or "Delta"),  to remedy claims of pregnancy discrimination, interference, retaliation, and unlawful failure to accommodate, in violation of Title VII of the Civil Rights Act of 1964, including the Federal Pregnancy Discrimination Act, 42 U.S.C. § 2000e *et seq.*; the Family Medical Leave Act, 29 U.S.C. §2601(b)(4); the Americans with Disabilities Act of 1990 ("ADA"), Pub. L. No. 101-336, § 2, 104 Stat. 328 (1990)*,* 42 U.S.C.A. § 12102 *et seq.*, as amended by § 504 of the Rehabilitation Act of 1972; New York State Paid Family Leave Act, 12 NYCRR § 380; New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1)(a) and the New York State Human Rights Law, N.Y. Exec. Law § 296(1) (hereinafter Title VII, the FMLA, the ADA, NYSPFLA, NYCHRL, and NYSHRL) and New York Labor Law § 162 (hereinafter NYLL).

## PARTIES

2.    Plaintiff Whitney Bravo is a woman, a mother of a 16-month old child, and an employee of Defendant at LaGuardia Airport located at 1 Delta Terminal #2, Queens, New York 11371.

3.    Defendant Delta Air Lines, Inc. is a private, international commercial airline employing more than 80,000 people worldwide, with assets of over $64 billion. Delta is headquartered in Atlanta, Georgia and has nine hubs across the continental United States, including at least 50 employees within 75 miles of Plaintiff's workplace in New York City.

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and § 1343, as Plaintiff has asserted claims that arise under federal laws of the United States.  This Court has supplemental jurisdiction over Plaintiff's state and city claims pursuant to 28 U.S.C. § 1367, as those claims are so related to federal claims in this action such that they form part of the same case or controversy.

5.    Venue is proper in the Eastern District of New York pursuant to 29 U.S.C. § 1391 (b)(2).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.    On November 20, 2019, Plaintiff filed a timely Charge of Discrimination ("Charge") with the U.S. Equal Employment Opportunity Commission ("EEOC").

7.    More than 180 days has elapsed since the EEOC assumed jurisdiction over the Charge. On November 16, 2020, the EEOC issued a Notice of Right to Sue to Plaintiff.

## FACTUAL ALLEGATIONS

8.      On September 4, 2017, Plaintiff was hired by Delta as a Ticket Counter Agent.

9.      She had just returned to the United States after four years living abroad in Chile, and she wanted a career that would allow her to travel. Her goal was to work hard at Delta, earn promotions, and eventually pursue a leadership position.

10.     Sure enough, Plaintiff excelled in the role of Ticket Counter Agent and was swiftly promoted to Gate Agent.

11.     Plaintiff excelled in this position of Gate Agent and on April 16, 2018, she was promoted to the position of Real Time Staff Manager ("RTSM"), a leadership position that entails a higher hourly wage than Gate Agent.

12.     As RTSM, Plaintiff's job was to monitor inbound and outbound flights, track delays and assign Delta agents their respective flights.

13.     As RTSM, from April 2018 to November 2019, Plaintiff worked four days per week from 4:00 am to 10:30 am.

14.     Plaintiff excelled in her role as RTSM. On March 15, 2018, she received a written commendation from Operations Service Manager Maurese Jenkins for her "outstanding service" after helping Delta and a five-year-old passenger through a traumatic situation wherein his mother was inebriated, missed her connecting flight and then left her young son alone in the airport.

### *Plaintiff Requests Reasonable Accommodation for Her Pregnancy-Related Disabilities*

15.     On or about the first week of November 2018, Plaintiff informed her direct supervisor Karen Lepre, Operational Service Manager, that she was pregnant.

16.     From the outset of her pregnancy, Plaintiff suffered terribly from nausea and on December 11, 2018, she was diagnosed with Hyperemesis Gravidarum ("hyperemesis"), which is characterized by persistent, severe nausea and excessive vomiting, leading to malnutrition and dehydration for both the mother and the fetus.

17.     Hyperemesis is a rare and potentially life-threatening condition that can require hospitalization and treatment with intravenous fluids.

18.     Plaintiff's hyperemesis was significantly worse in the morning, and was particularly debilitating during her morning shift, which required her to wake at 2:00 am in order to arrive at her workplace at 4:00 am.

19.     As a result of her condition, including relentless vomiting some mornings, Plaintiff was understandably late or absent on several occasions in November and December of 2018. On each such occasion, she expressly informed management that her lateness or absence had been caused by her pregnancy-related illness.

20.     On or about December 11, 2018, Plaintiff submitted a reasonable accommodation request to Lepre, requesting to switch from the morning shift to the afternoon shift in order to avoid working while her symptoms were at their worst. Plaintiff also emailed Lepre and Sedgewick, Delta's third-party benefits administration company, a letter from her treating obstetrician's office, Garden ObGyn, which stated that she was "experiencing hyperemesis in the mornings" and thus had a medical need for this accommodation.

21.     On or about December 15, Plaintiff called Delta's Equal Opportunity ("EO") Accommodations department and left a voicemail inquiring about the status of her request for accommodations, but nobody returned her call.

22. By email dated December 16, 2018, Plaintiff notified *accommodations@delta.com* of her prior voice mail and request for accommodations.

### Delta Subjects Plaintiff to Retaliatory Discipline

23. On December 16, 2018 – the same day as Plaintiff sent her follow-up email regarding reasonable accommodation – Lepre issued Plaintiff a written reprimand regarding her late arrivals and absences, which Lepre knew had been caused by the very pregnancy-related illness for which Plaintiff had requested the reasonable accommodation that Delta had denied in the first place.

24. Delta did not have any uniform time and attendance policy; rather, it was up to each individual supervisor to decide whether or not to discipline any particular employee for time and attendance issues.

### Delta Denies Plaintiff's Request for Reasonable Accommodations Without Any Individualized Analysis, Interactive process or Cooperative dialogue

25. By email dated December 17, 2018, Equal Opportunity Accommodations Lead Program Manager Annelyse Sanders notified Plaintiff that her request for accommodations had been referred to Sedgewick, "to handle as a maternity reassignment."

26. On or about December 18, 2018, Plaintiff received a phone call from a Sedgwick representative, Janice Lawrence, who stated that Delta had officially denied Plaintiff's request due to "operational needs."

27. No one at either Sedgwick or at Delta engaged in any individualized analysis, interactive process or cooperative dialogue with Plaintiff regarding how best to accommodate her conditions.

28. Moreover, there were in fact afternoon RTSM shifts available, and Delta could have reassigned Plaintiff to these shifts without any hardship. For example, in November and early

December 2018, two RTSMs who worked afternoon shifts had vacated their positions at LaGuardia: Capricia Hargrove had resigned and Deja Jenkins had transferred to another airport. In fact, Delta had begun training gate agents to fill in as backup RTSM agents to temporarily fill these newly-vacant afternoon shifts.

29.     Lawrence specified that Plaintiff could only be reassigned to the afternoon shift if she were to accept a demotion to the position of gate agent at a lower hourly rate.

30.     Given her physical condition, Plaintiff could not accept demotion to the position of gate agent, as this job required heavy lifting and thus defeated the entire purpose of the accommodation. Nor could she afford to accept a pay cut, especially now that she had a baby on the way.

31.     She therefore had to continue working morning shifts as an RTSM, notwithstanding her crippling nausea, vomiting and fatigue during those hours. All this while, Delta had multiple, readily available afternoon shifts that Plaintiff could have filled, but refused to transfer her to the afternoon shift despite her requests for reasonable accommodations.

32.     By contrast, Delta readily accommodated similarly situated employees who were not pregnant. For example, Ruth Pombar, a non-pregnant gate agent, needed to leave her post every day at 6:00 pm to take medication for a health condition. Upon information and belief, Delta timely responded to her request for this accommodation and allowed her to leave her post each day at 6:00 pm. Sabrina Samuels, another non-pregnant gate agent, had to take medication every day between 7:00 and 8:00 pm, and upon information and belief her request for such accommodation was timely granted as well.

***Plaintiff Complains of Retaliation***

33.     In or about late December 2018, Plaintiff met with Regional Manager Ginny Elliot and Human Resources ("HR") representative Greta Boggan and complained that she should not have been written up for her pregnancy-related absences. Plaintiff also stated that due to such discrimination, she planned to retain legal counsel.

34.     In response, Boggan advised Plaintiff to take an unpaid leave of absence for the duration of her pregnancy. However, Plaintiff could not afford to take an unpaid leave of absence, especially with a baby on the way.

***Plaintiff's Prenatal Health Deteriorates, Resulting in Hospitalization and Risk of Death***

35.     In or about January 2019, medical tests revealed that Plaintiff had dangerously high levels of Inhibin A, which made her pregnancy "high-risk" and also put her at risk for pre-eclampsia, placental adhesion, preterm labor and stillbirth.

36.     On February 3, 2019, Plaintiff began to vaginally bleed while at work and called a coworker to get her an ambulance. Plaintiff was rushed to Huntington Hospital, where her physicians ordered bedrest through February 6, 2019, and provided her with a note explaining this requirement to Delta.

37.     Later that month, RTSM Francis Natera transferred out of the afternoon shift, creating yet another vacancy on the RTSM afternoon shift. Still, Plaintiff was not permitted to transfer to the afternoon shift, notwithstanding her request for a reasonable accommodation.

38.     Following her bedrest, Plaintiff continued to suffer from extreme nausea and vomiting, as well as pain in her increasingly swollen legs and feet.

39.    Dr. Felicia Callan, Plaintiff's obstetrician, and Dr. Luis Bracero, Plaintiff's high-risk

obstetrician, both determined that the swelling in Plaintiff's legs was an early sign of pre-

eclampsia, a potentially fatal condition that can occur after 20 weeks of pregnancy.

***Plaintiff Requests Alternative Accommodations; Delta Grants One and Ignores the Other***

40.    Dr. Callan therefore instructed Plaintiff to request an accommodation from Delta to allow

her to wear shoes that were less constricting than the ones her uniform required, and to elevate

her legs at breaktime. Dr. Callan also provided Plaintiff with a note stating the medical necessity

for these accommodations.

41.    Normally, Plaintiff was not allowed any breaks during the workday, and even had to

work through her unpaid meal breaks in order to complete her heavy workload.

42.    By email dated Sunday, February 10, 2019, Plaintiff requested both of these

accommodations from Delta, once again attaching a doctor's note in support of her request.

43.    On or about February 14, 2019, a Sedgwick representative granted Plaintiff permission to

wear more suitable shoes, but ignored Plaintiff's request to elevate her legs, despite the fact that

Plaintiff was legally entitled to breaks during which she could have done so.

44.    Delta failed to allow Plaintiff a proper lunch break during which to elevate her legs.

45.    Additionally, Delta could have easily provided Plaintiff with a stool or other object upon

which to elevate her legs while working at her desk, but they failed to do so.

46.    On Sunday, February 17, 2019 and Monday, February 18, 2019, Plaintiff was unable to

go to work due to vomiting, pain and vaginal bleeding. She provided a physician's note to Delta

and Sedgewick, explaining the medical necessity for this absence.

***Delta Disparately Prohibits Plaintiff from Compressing Her Work Week***

47.     Because she was not permitted to elevate her legs at work, Plaintiff attempted to compress her work week into three consecutive days per week by switching shifts with a colleague, Natasha Williams and working a double shift each week so that she could elevate her legs at home for several days in a row.

48.     However, upon discovering that Plaintiff was swapping shifts with Ms. Williams, Delta management instructed Ms. Williams not to swap any more shifts with Plaintiff.

49.     This is particularly striking, as Plaintiff had swapped shifts and compressed her schedule without issue for several months before announcing her pregnancy.

50.     Notably, there was no policy or practice which would have prohibited the swapping of shifts, which Plaintiff's colleagues did regularly without incident.

51.     Plaintiff was therefore trapped in a schedule that required her to work throughout the worst of her nausea and remain on her swollen feet and legs throughout the week.

52.     Defendant's excessive hostility toward Plaintiff's fragile health caused her extreme emotional and physical distress.

53.     On or about April 21, 2019, Plaintiff began having labor contractions while at work.

54.     Plaintiff's doctors advised her that working might be bringing on contractions, and they therefore put her on mandatory bed rest to avoid a pre-term delivery.

55.     Plaintiff's physicians warned her that if she went into preterm labor at this juncture, the baby was not likely to survive. They also informed her that her brutal work hours and conditions and hostile work environment were aggravating her physical condition and seriously jeopardizing her pregnancy.

56.     Plaintiff therefore went on short-term disability starting April 21, 2019.

57.    On April 23, 2019, Plaintiff applied for promotion to a full time Tower[1] position at Delta, which would have come along with a significant pay increase. However, she never received any response to her application, nor any opportunity to interview for the position.

***Plaintiff Gives Birth Prematurely; Suffers Heart Failure***

58.    On June 19, 2019, Plaintiff's blood pressure skyrocketed dangerously and she was rushed again to Huntington Hospital, and where she was diagnosed with pre-eclampsia. Emergency preterm labor was induced and she gave birth prematurely on June 22, 2019. Due to fluid in his lungs, Plaintiff's baby was rushed to the Neonatal Intensive Care Unit and remained there for approximately two days.

59.    At the time of her discharge on June 24, 2019, Plaintiff was still experiencing high blood pressure.

60.    Plaintiff then began to experience chest pains and shortness of breath, and was therefore readmitted to the hospital on June 26, 2019, where she was diagnosed with pulmonary edema and heart failure.

61.    Plaintiff's cardiologist advised her that her heart failure was likely due to the preterm induction of labor.

62.    Plaintiff's pulmonologist additionally diagnosed her with asthma as a result of her labor and postpartum health complications.

63.    Plaintiff's paid maternity leave ended on August 2, 2020.

64.    As Plaintiff had had to go on short-term disability leave in April to avoid losing her baby, her short-term disability was only approved through October 21, 2019.

---

[1] Tower employees perform air traffic control and coordinate the landing and parking of planes.

65.     Accordingly, Plaintiff took unpaid medical leave from October 22, 2019 through November 14, 2019.

66.     Going without a paycheck during that period was a financial burden that compounded Plaintiff's emotional distress and marred what should have been a special time bonding with her new baby.

### Plaintiff Files an EEOC Charge and Returns to Work

67.     On November 20, 2019, Plaintiff filed an EEOC Charge of discrimination against Delta.

68.     Also in November 2019, Plaintiff returned to work as an RTSM, this time under the supervision of OSM Maurese Jenkins, who asked her what days and hours she would prefer to work. She stated her preference for a compressed schedule of three eight-hour days instead of four six-hour days, and he accommodated her request.

### Delta Refuses to Consider Plaintiff for Promotion

69.     At this time, she applied for two promotions: Specialist, Corporate Sales Development and Specialist, NYC Online Booking Tool Strategy. However, Plaintiff never received any response to her applications, nor any chance to interview for these positions, which were filled by other employees.

70.     By email dated November 25, 2019, Plaintiff also inquired about the status of her April application for a Tower position, and asked Tower Operational Services Manager Anthony Lepre, who is married to Plaintiff's supervisor Karen Lepre, for an opportunity to shadow in the Tower. After initially agreeing to this request, Anthony Lepre never actually allowed Plaintiff to shadow in the Tower. The position was later filled by another employee.

71.     Plaintiff was distressed by Delta's refusal to even consider her for promotion.

72.    Nonetheless, under Jenkins' supervision, Plaintiff worked as an RTSM successfully and without incident from November 2019 until March 2020.

73.    By March 17, 2020 the COVID-19 pandemic had broken out, and due to her heart, respiratory and pulmonary conditions, Plaintiff went on paid "high-risk leave," which Delta offered to employees who deemed themselves to be at high risk for COVID-related complications and death."

***Delta Singles Plaintiff Out for a "Relief Line" Schedule and Summons Her Back to Work Amid the Pandemic, Despite Her Serious Health Issues***

74.    On or about July 20, 2020, Delta informed Plaintiff that her paid high-risk leave was ending and that she must return to work at LaGuardia Airport on August 1, 2020, notwithstanding the COVID-19 pandemic.

75.    However, due to Plaintiff's heart, respiratory and pulmonary conditions, she was at high-risk for COVID-related complications and death if she were to contract the virus from coworkers or customers in her customer-facing role at LaGuardia, which is itself in a high-risk location.

76.    Further, Delta had assigned Plaintiff to return to an irregular "relief line" schedule, the hours of which were subject to change at any time. This meant that, even apart from her medical issues, she would not be able to make necessary childcare arrangements because she would have no prior notice of her work hours.

77.    Plaintiff checked Delta's online staffing spreadsheets and learned she was the only Delta RTSM at any location who was selected for an unpredictable "relief line" schedule at this time; her fellow RTSMs all received regular schedules with set hours.

78.    In addition to being the only RTSM assigned to a "relief line" schedule, Plaintiff was also the only Delta employee of any kind at LaGuardia Airport who was assigned to a "relief line" schedule.

79.     It therefore appeared to Plaintiff that Delta was singling her out with an untenable

schedule in a retaliatory attempt to engineer her resignation and effectuate her constructive

discharge.

***Delta Denies Plaintiff's Request for Delta's Unpaid "Voluntary" Leave Program***

80.     On or about July 6, 2020, Plaintiff applied for six months of voluntary, unpaid leave

through the leave application form on Delta's employee website, but her request was flatly

denied by Operational Service Manager Alex Fiore on July 15, 2020.

81.     Plaintiff asked Fiore how much, if any, voluntary unpaid leave was available to her, but

he never responded.

82.     This denial was particularly striking because (a) the leave requested was unpaid, and (b)

Plaintiff subsequently learned that a colleague of hers in Delta customer service was granted

a full year of voluntary unpaid leave in light of the pandemic.

83.     In July of 2020, in response to Plaintiff's EEOC Charge, Delta shifted defenses and

began to claim, for the first time, that their seniority system had made it impossible to

accommodate Plaintiff by reassigning her to the afternoon shift.

84.     However, Delta's Airport Customer Service/Cargo Divisional Practices Manual explicitly

states that RTSM positions "are not filled by seniority."

85.     Plaintiff then applied for unpaid medical leave to begin on August 1, 2020, and she was

granted such leave through December 31, 2020.

86.     Since then, she has been without any income, which has placed her family in financial

peril following the birth of their first child.

*Plaintiff Suffers Emotional Distress, Plus Long-Term Impact on Her Health and Career*

87.     The ripple effect of the written reprimands she received as a result of her pregnancy complications have already prevented her from being promoted, and will be felt well into the future of her employment at Delta.

88.     Delta's denial of Plaintiff's two reasonable accommodation requests and its refusal to allow her to compress her work schedule directly contributed to her development of pre-eclampsia, which necessitated induction of preterm labor, pulmonary edema and heart failure, carries lifelong health implications for Plaintiff, including but not limited to permanent high-risk pregnancy designation for any future pregnancies.

89.     Plaintiff's physicians have warned her against future pregnancies, and have advised her that under no circumstances should she become pregnant within the next few years.

90.     In addition to the physical injury and trauma, Plaintiff was also emotionally traumatized by Delta's treatment of her during her pregnancy, including its discriminatory, unreasonable and reckless denial of her reasonable accommodation requests.

91.     The financial burden caused by the loss of her income has compounded her emotional distress.

92.     But for Delta's denial of accommodations during Plaintiff's high-risk pregnancy, she would not have developed the heart, respiratory and pulmonary conditions that put her at high risk for COVID-related death, and she would not have lost her income.

## FIRST CAUSE OF ACTION:
### Discrimination in Violation of Title VII

93.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

94.     Defendant unlawfully discriminated against Plaintiff in the terms and conditions of her employment, and failed to grant her requests for reasonable accommodations related to her pregnancy, in violation of Title VII, as amended by the PDA.

95.     Defendants readily granted reasonable accommodations to other similarly situated employees who were not pregnant, thereby raising a reasonable inference that Defendants' failure to reasonably accommodate Plaintiff was based at least in part on Plaintiff's protected status as a pregnant woman.

96.     Defendant's discriminatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional distress damages.

97.     Defendant acted willfully, with malice and/or reckless indifference to Plaintiff's rights, therefore entitling Plaintiff to an award of punitive damages.

Therefore, Defendant is liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, cost and disbursements.

## SECOND CAUSE OF ACTION:
### Failure to Accommodate in Violation of the ADA

98.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

99.     Plaintiff had a disability within the meaning of the ADA, in the form of severe medical complications resulting from her pregnancy, including but not limited to Hyperemesis

Gravidarum, pre-eclampsia, heart failure, pulmonary edema, high blood pressure, and swollen legs.

100.     Defendant is an employer covered by this statute and had notice of Plaintiff's two requests for reasonable accommodations.

101.     Plaintiff was qualified and could perform the essential functions of her job, with or without the reasonable accommodation.

102.     By the forgoing acts and omissions, including but not limited to failing to grant Plaintiff's requests for reasonable accommodations related to switching her shift from morning to afternoon; compressing her work days; and elevating her legs, Defendant failed to accommodate Plaintiff's request for a reasonable accommodation in violation of the ADA.

103.     Defendant's discriminatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional distress damages.

104.     Therefore, Defendant is liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, liquidated damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

### THIRD CAUSE OF ACTION:
**Retaliation in Violation of the ADA**

105.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

106.     Plaintiff had a disability within the meaning of the ADA, in the form of severe medical complications resulting from her pregnancy, including but not limited to Hyperemesis Gravidarum. pre-eclampsia, heart failure. pulmonary edema, high blood pressure, and swollen legs.

107. Defendant is an employer covered by this statute and had notice of Plaintiff's request for a reasonable accommodation.

108. Plaintiff was qualified and could perform the essential functions of her job, with or without the reasonable accommodation.

109. By the forgoing acts and omissions, including but not limited to failing to accommodate Plaintiff's requests for reasonable accommodations, writing her up for disability-related absences and repeatedly refusing to consider her for promotion, Defendant retaliated against Plaintiff for her request for a reasonable accommodation in violation of the ADA.

110. Defendant's discriminatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional distress damages.

Therefore, Defendant is liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, liquidated damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

### FOURTH CAUSE OF ACTION:
### Discrimination in Violation of the NYSHRL

111. Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

112. Defendant unlawfully discriminated against Plaintiff in the terms and conditions of her employment on the basis of her pregnancy, in violation of the NYSHRL.

113. Defendant's unlawful discriminatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional distress damages.

114. Defendant acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling them to an award of punitive damages.

Therefore, Defendant is liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, cost and disbursements.

**FIFTH CAUSE OF ACTION:**
**Retaliation in Violation of the NYSHRL**

115.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

116.    Defendant unlawfully retaliated against Plaintiff in the terms and conditions of her employment on the basis requests for reasonable accommodations, in violation of the NYSHRL.

117.    Defendant's unlawful retaliatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional distress damages.

118.    Defendant acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling them to an award of punitive damages.

119.    Therefore, Defendant is liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, cost and disbursements.

**SIXTH CAUSE OF ACTION:**
**Discrimination in Violation of the NYCHRL**

120.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

121.    Defendant unlawfully discriminated against Plaintiff in the terms and conditions of her employment on the basis of her pregnancy and pregnancy-related disabilities, in violation of the NYCHRL.

122. Defendant failed and refused to enter into any interactive process, individualized assessment or cooperative dialogue with Plaintiff regarding how best to accommodate her pregnancy-related disabilities.

123. Defendant's unlawful discriminatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional distress damages.

124. Defendant acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

Therefore, Defendant is liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, cost and disbursements.

**SEVENTH CAUSE OF ACTION:**
**Retaliation in Violation of the NYCHRL**

125. Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

126. Defendant unlawfully retaliated against Plaintiff in the terms and conditions of her employment on the basis requests for reasonable accommodations, in violation of the NYCHRL.

127. Defendant's unlawful retaliatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional distress damages.

128. Defendant acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling them to an award of punitive damages.

129. Therefore, Defendant is liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, cost and disbursements.

**EIGHTH CAUSE OF ACTION:**

## Breaks Violation – New York Labor Law

130.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

131.    Pursuant to NYLL § 162, Plaintiff was entitled to a mid-shift 45-minute unpaid meal break during each shift of six or more hours commencing between the hours of 1:00 pm and 6:00 am.

132.    In violation of NYLL § 162, Defendant did not allow Plaintiff any meal breaks or other breaks during her work shifts, all of which were more than six hours long in duration.

133.    Defendant acted willfully, with malice and/or reckless indifference to Plaintiff's rights, thereby entitling her to an award of liquidated damages in an additional amount equal to 100% of her monetary damages.

134.    Therefore, Defendant is liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, 100% liquidated damages, prejudgment interest, post-judgment interest, attorneys' fees, cost and disbursements.

## <u>DEMAND FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment that:

a)      declares that the discriminatory actions, practices, and policies of Defendant as set forth above violated Title VII, including as amended by PDA, the ADA, the NYSHRL and the NYCHRL;

b)      declares that the retaliatory actions, practices and policies of Defendant set forth above violated Title VII, including as amended by the PDA, the ADA, the NYSHRL and the NYCHRL;

c)      declares that the actions, practices and policies of Defendant set forth above violated the NYLL;

d)      awards monetary damages to Plaintiff to compensate her for the discrimination she experienced, including economic damages, and damages for emotional distress;

e)      awards Plaintiff punitive damages pursuant to Title VII;

f)      awards 100% liquidated damages pursuant to the NYLL;

g)      awards Plaintiff pre- and post-judgment interest in the amount of 9 percent *per annum*;

h)      awards Plaintiff reasonable attorneys' fees and costs; and

i)      grants such other relief as this Court deems just and proper.


**DEMAND FOR TRIAL BY JURY**

Pursuant to FRCP § 38(b), Plaintiff demands a trial by jury.



Dated: New York, New York
            November 27, 2020

                                                    Respectfully submitted,
                                                    Crumiller P.C.

                        By:     _____
                                                    Chloe Liederman
                                                    16 Court St., Ste 2500
                                                    Brooklyn, NY 11241
                                                    (212) 390-8480
                                                    cl@crumiller.com
                                                    *Attorneys for Plaintiff*